UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

| | | |
|---|---|---|
| JANEEN SMITH | ) | |
| | ) | |
| V. | ) | NO. 2:15-CV-67 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security | ) | |

REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. This is an action for review of an administrative decision rendered after a hearing before an Administrative Law Judge ["ALJ"] which denied the plaintiff's applications for disability insurance benefits and supplemental security income under the Social Security Act. The Plaintiff has filed an Amended Motion for Judgment on the Pleadings [Doc. 21], and the defendant Commissioner has filed a Motion for Summary Judgment [Doc. 25].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor

resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff was 39 years old at the time of her alleged disability onset date of June 1, 2010. She is now 45, still a "younger" individual under the regulations. She has a high school education. The ALJ found that she cannot perform her past relevant work (Tr. 26).

The plaintiff's medical history is set forth in the Commissioner's brief as follows:

> In January 2008, Plaintiff went to the emergency room after twisting her right knee (Tr. 201). X-rays showed her knee was intact and there was no fracture or dislocation (Tr. 213). Records from Cynthia Poortenga, M.D., from February 17, 2009, through March 23, 2010, show that Plaintiff's blood sugar levels ranged from 80 to 120 (Tr. 228-234). In December 2009, Dr. Poortenga wrote that Plaintiff's feet looked great (Tr. 229). Plaintiff weighed 235 pounds in March 2010 (Tr. 228).
> Records after Plaintiff's June 1, 2010, alleged onset date show that Plaintiff had some lower extremity swelling in September 2010, and her blood sugars ranged from 80 to 120 (Tr. 358). Plaintiff reported to the emergency room for a persistent headache several times in April 2011 (Tr. 179-180, 193-200, 203-05). On April 27, 2011, Plaintiff went to the emergency room for a headache, and her blood sugar was elevated at 338, her A1C (measurement of glucose over time) was 10.5 percent, and she was admitted for observation (Tr. 177, 180). CT scans of her head and brain were normal (Tr. 181- 82). After being given insulin, Plaintiff's blood sugar decreased to 220 (Tr. 178). She was released in stable condition on April 29, 2011 (Tr. 177-78). A May 11, 2011 brain MRI was normal (Tr. 212). Treatment notes from Dr. Poortenga in May 2011 show that Plaintiff

started insulin injections and that her blood sugars were in the low 100s (Tr. 219-220). On July 13, 2011, Plaintiff's A1C was at 9.0% (Tr. 238). Her A1C on October 12, 2011 was 10.2% (Tr. 236). On January 23, 2012, Plaintiff's A1C was 10.5 percent, and her blood sugar ranged from 90 to 110 (Tr. 216, 235). She weighed 270 pounds at this appointment (Tr. 216).

On June 7, 2012, Wayne P. Glibert, M.D., performed a consultative physical examination of Plaintiff (Tr. 249-252). He wrote that she was diagnosed with diabetes in 1998 and placed on oral medication, and she started insulin in May 2011 (Tr. 249). Plaintiff reported monitoring her blood sugar 2 to 3 times per day, with results ranging from 60 to 120 (Tr. 249). She reported no complications from her diabetes (Tr. 249). Plaintiff told the doctor she had been overweight since her teens and slowly gained weight since then (Tr. 249). She reported joint pain at her knees and ankles, but she had no current treatment for her knees or ankles, no surgeries, and no recent x-rays (Tr. 249). Plaintiff also reported vision problems with depth perception issues since childhood (Tr. 249). She had a driver's license, and she used reading glasses (Tr. 249). Plaintiff further reported having a learning disability and reaction to the pertussis vaccine as a child, which she reported caused fine and gross motor problems and depth perception issues (Tr. 250). She told Dr. Gilbert that she was fired in 2010 (Tr. 250).

Upon examination, Plaintiff was 63 inches tall and weighed 267 pounds (Tr. 251). Her uncorrected vision was 20/40 in her right eye, 20/40 in her left eye, and 20/30 in both eyes (Tr. 251). The doctor observed Plaintiff walked without an antalgic gait, had negative straight leg raise, and had full range of motion in her neck, upper extremities, elbows, wrists, hands, hips, knees, and ankles (Tr. 251). She had normal grip strength, and her muscle strength was four to five out of five (Tr. 251). Although she needed help rising from squatting, she could squat, walk on her heels and toes, stand on one foot, and walk heel-to-toe (Tr. 251). She had limited flexion at 70 degrees in her dorsolumbar spine, but the remainder of her range of motion was normal (Tr. 251). The doctor noted that Plaintiff's reported ankle pain, knee pain, and fine and gross motor skill impairments were not apparent on examination (Tr. 251-52). The doctor opined Plaintiff would be limited to walking 30 minutes or 100 yards and standing for 30 minutes (Tr. 252). He opined she should limit squatting and climbing hills or stairs (Tr. 252).

On July 13, 2012, B. Wayne Lanthorn, Ph.D., provided a consultative mental status examination (Tr. 257-260). Plaintiff told the doctor she had never had any formal mental health treatment (Tr. 259). Dr. Lanthorn observed that Plaintiff walked without gait difficulty, and she rated her average pain level in her knees and ankles at a four or less (Tr. 258-59). Plaintiff reported that she enjoyed using Facebook and spending time with her husband (Tr. 259). She had average energy, although she felt nervous when her blood sugar was low (Tr. 259). Dr. Lanthorn described her mood as euthymic, her communication skills were intact, and she appeared to exercise appropriate self-care (Tr. 259). Plaintiff told the doctor she had a valid driver's license and that she performed the chores at home (Tr. 259). He noted that she worked for 15 years at the same job (Tr. 258). Dr.

3

Lanthorn opined Plaintiff had borderline intellectual functioning, but he found that her allegations of psychologically-disabling conditions lacked credibility (Tr. 260). He opined her prognosis was good and she could manage her own funds (Tr. 260). In support of his conclusions, Dr. Lanthorn cited Plaintiff's valid driver's license and her ability to do virtually all of the housekeeping chores at home and shop with her husband (Tr. 260). In addition, he noted Plaintiff had no difficulties with depression or anxiety, no sleep or appetite disturbances, a stable work history, intact communication skills, and appropriate self-care (Tr. 260). He opined that no psychological impairments limited Plaintiff's ability to work (Tr. 260).

Dr. Lanthorn also completed a mental source statement, in which he opined Plaintiff had no limitations in her ability to understand, remember, and carry out simple instructions and make judgments on simple work-related decisions (Tr. 261). He noted moderate difficulties in her ability to understand, remember, and carry out complex instructions and make judgments on complex work-related decisions, citing Plaintiff's borderline intellectual functioning (Tr. 261).

The doctor found Plaintiff had no limitations in her ability to interact with the public, supervisors, and coworkers (Tr. 262). Finally, he opined she could respond appropriately to usual work situations and changes in routine (Tr. 262).

On July 18, 2012, Victor O'Bryan, Ph.D., a state agency psychological consultant, opined that Plaintiff had no severe mental impairments and no functional limitations (Tr. 264-276). Dr. Bryan wrote that although Dr. Lanthorn diagnosed borderline intellectual functioning, he thought a learning disorder was more likely (Tr. 276). On July 20, 2012, Reeta Misra, M.D., a state agency medical consultant, reviewed Plaintiff's records and opined that her physical impairments were nonsevere (Tr. 283). The doctor acknowledged Plaintiff's history of diabetes, obesity, vision impairment, and headaches (Tr. 286). However, she noted Plaintiff had normal physical examinations, no evidence of end organ damage related to diabetes, no neurological deficiency, and normal gait (Tr. 286). Dr. Misra wrote that she considered the combination of Plaintiff's physical and mental impairments and found they were nonsevere (Tr. 286). On September 17, 2012, Andrew Phay, Ph.D., a state agency psychological consultant, affirmed Dr. O'Bryan's findings of no severe mental impairment (Tr. 291). Michael Ryan, M.D., a state agency medical consultant, affirmed Dr. Misra's findings of no severe physical impairment in a September 19, 2012 opinion (Tr. 296).

In August 2012, Dr. Poortenga recorded Plaintiff's blood sugars as 80 to 120 (Tr. 289). Medical records from Church Hill Free Clinic show that on September 18, 2012, Plaintiff's blood sugars ranged from 80 to 130, and she was doing well and staying on a diet (Tr. 332). Her A1C was 10.3 percent (Tr. 303). On October 3, 2012, Plaintiff received counseling regarding diet, weight loss, exercise, and monitoring her blood sugar levels (Tr. 331). Specifically, Plaintiff was given written instructions to test and record her blood sugar three times per

4

day, follow a low-fat diet, and walk three times per day (Tr. 330). On October 30, 2012, Plaintiff was told to keep working on her diet and walk in the hallway (Tr. 328). A diabetes foot examination showed both feet were within normal limits (Tr. 305). Plaintiff was noted to be doing well in December 2012 (Tr. 326). In January 2013, Plaintiff's treatment notes state she only had two weeks of blood sugar recordings (Tr. 324). She was again told to test her blood sugar three times per day, watch portion sizes, and exercise (Tr. 323). Her A1C level was 10.9 percent (Tr. 300). In February 26, 2013, the nurse stressed to Plaintiff the importance of getting her blood sugars under control, and she again counseled Plaintiff regarding diet and testing (Tr. 321-22). In April 2013, a foot sensation screening was normal, and her A1C level was 11.5 percent (Tr. 300). (Tr. 319). Notes indicate Plaintiff was doing well with a stable blood sugar reading at 95, and she again received counseling regarding diet and exercise (Tr. 317, 319). An undated treatment note states that Plaintiff's A1C level was elevated at 11.5 percent, but the provider noted Plaintiff was noncompliant with her diet, lived a sedentary lifestyle, and skipped medication doses (Tr. 316). Similarly, another treatment note repeats these findings and adds that she refused to test adequately (Tr. 312). A note from July 16, 2013, states that the provider called Plaintiff to stress the importance of take and record her medications as instructed (Tr. 310). Plaintiff's July A1C reading was 11.1 percent (Tr. 300).

     On October 3, 2013, Plaintiff saw David Schilling, M.D., at Church Hill Family Practice for a "disability exam" (Tr. 406-08). Plaintiff told the doctor that she had no numbness or tingling in her feet, and she said that a nurse told her she had "charcot foot" (a condition causing weakening of bones in the foot that can occur in people who have significant neuropathy) (Tr. 406). Upon examination, Plaintiff weighed 270 pounds (Tr. 407). Dr. Schilling observed that Plaintiff's ankles and feet appeared swollen, but he stated he could not tell from her examination whether she had charcot deformities, and that an x-ray was required (Tr. 407-08). The doctor performed a diabetic foot exam, and he found both feet were normal with full range of motion (Tr. 407-08). He assigned her foot risk category at zero, stating there was no deformity or present risk (Tr. 408). Plaintiff had some decreased range of motion in her lumbar spine, with vertical flexion at 80 degrees, extension at 5 degrees, and lateral flexion at 30 degrees on both sides (Tr. 407).

[Doc. 26, pgs. 4-9].

At the administrative hearing on October 7, 2013, the ALJ took the testimony of Bentley Hankins, a vocational expert [VE]. The ALJ asked Mr. Hankins to assume a person of plaintiff's age, education, and work history, who "regardless of exertional limitations" had the non-exertional limitations opined by Dr. Lanthorn (Tr. 45). Mr.

5

Hankins opined that with those mental limitations, the hypothetical individual would be able to perform a significant number of simple jobs in the state and national economies (Tr. 45). If that person had the limitations on walking and standing opined by Dr. Gilbert, the VE opined there would be no jobs (Tr. 46-47).

The ALJ rendered his hearing decision on November 5, 2013. He first explained the five step evaluation process utilized to determine if a claimant is in fact disabled found at 20 C.F.R. § 404.1520 (b-g) and 416.920(b-g). He noted that it was his duty, before considering step four, to determine the plaintiff's residual functional capacity ["RFC"]. He correctly stated that "[i]n making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe…" citing the above referenced regulations and Social Security Ruling ["SSR"] 96-8p. (Tr. 17-18).

After finding that the plaintiff had not engaged in substantial gainful activity since her alleged onset date of June 1, 2010, the ALJ found that the plaintiff had the severe impairment of "estimated borderline intellectual functioning." (Tr. 18). He then stated that "[h]aving found that the claimant has a severe impairment, it is incumbent upon the undersigned to consider limitations and restrictions imposed by all of the claimant's alleged impairments, even those that are not severe. Therefore, the undersigned has considered the claimant's allegations of back, ankle and knee pain; diabetes; chronic fatigue; and the residuals from an adverse reaction to a childhood immunization." (Tr. 19).

6

He discussed the plaintiff's hearing testimony. Then he began to discuss the evidence in the medical records regarding her other conditions described above and her obesity which plaintiff alleged were severe. He found no evidence of any complaints of musculoskeletal pain or limitations. He noted in detail the exam findings of Dr. Gilbert, the consultative examiner, which were mostly negative (Tr. 19). He discussed the plaintiff's exam on October 3, 2013 by her treating doctor, Dr. David Schilling, who likewise had made mainly negative findings. He noted that the plaintiff had not required physical therapy, steroid injections, pain clinic support or any surgery. She had not been prescribed medication management of any sort for her musculoskeletal pain. He therefore found that any limitations from musculoskeletal pain were minimal, and the condition did not constitute a severe impairment (Tr. 19-20).

He then discussed the plaintiff's diabetes. He noted the treatment and findings by her treating sources. He noted that "[a]lthough diabetes can be a very serious disease process, the medical evidence does not reflect any residual deficits, which are generally associated with diabetes." (T. 20). Moreover, he stated that her foot exams were consistently negative. Also, he noted there was no documentation of neuropathy or retinopathy, nor any finding of organ damage. He also noted that the plaintiff was not compliant with taking her medication, that she maintained a sedentary lifestyle, and did not test her blood sugar adequately. He stated that she was noncompliant in taking her medication. He also noted that the plaintiff reported no complications from her diabetes when discussing her complaints with Dr. Gilbert. Since her condition and symptoms

7

could be controlled with diet, lifestyle changes, and taking medication, he found her diabetes only resulted in minimal restrictions and was not severe (Tr. 20).

He noted that although she had attended the Palmer Memorial Center for Crippled Children as a child, she had later attended regular school without accommodations for a physical handicap resulting from her childhood immunization. Also, he noted that she worked for 15 years as an adult as a grill cook. Dr. Gilbert found no evidence of fine or gross motor deficiencies, with normal grip strength and full range of motion in her upper extremities. He stated that "[t]he fact that the claimant was able to successfully work for fifteen years in a medium-exertion job strongly suggest that the alleged balance, coordination, manipulation and vision difficulties are not as severe as the claimant contended." (T. 21). Therefore, he found that any resulting effects from her childhood immunization were not severe.

Finally, he discussed in detail the plaintiff's obesity. He noted that she was 63 inches tall and that her weight since the alleged onset date had ranged from 235 to 270 pounds. Her body mass index of 47.8 indicated that she was morbidly obese. He noted that Dr. Gilbert limited the plaintiff in walking and standing due to her weight. The ALJ mentioned that the plaintiff had been obese during her 15 years of work as a grill cook. He noted her daily activities including caring for her health and hygiene, caring for her father-in-law and pet, preparing daily meals, cleaning, doing laundry, shopping and visiting relatives. He considered these specifically pursuant to the dictates of SSR 02-1p. Based upon all of this, he found that the plaintiff's obesity was a non-severe impairment

(Tr. 21).

Mentally, the ALJ found that the plaintiff had no restriction in her activities of daily living or social functioning, and moderate difficulty with concentration, persistence, or pace (Tr. 22). He then found that she has the residual functional capacity ["RFC"] to perform a full range of work at all exertional levels, except she could only understand, remember and carry out simple instructions, and make judgments on simple, work related tasks (Tr. 23). Regarding her non-exertional mental impairment, the ALJ discussed her school records, which showed basically difficulties in learning math and her IQ scores. Only her performance IQ of 78 was in the borderline range, and on a repeat test it was 81, which was normal. Even though she struggled with math, she still passed and graduated 174th out of 340 students in her high school graduating class.

He discussed Dr. Lanthorn's consultative exam. Dr. Lanthorn noted that the plaintiff had a stable work history. After testing he found she was functioning in the borderline range at the present time. Although she would have moderate limitations in her ability remembering and carrying out complex instructions, or making complex job decisions, she had no limitation in working with others in a routine work setting. He noted that Dr. Lanthorn opined she had no substantial mental limitations which would prevent her from sustaining employment (Tr. 24-25).

The ALJ found that the plaintiff was not completely credible for the reasons stated above regarding the effects of her conditions on her physical and mental activities. He then assessed the weight given to the medical sources. He gave great weight to the

9

opinion of Dr. Lanthorn. With respect to Dr. Gilbert, the ALJ noted that his physical exam findings were "grossly normal," but that Dr. Gilbert had placed significant limitations on the plaintiff based solely on her obesity. For the reasons mentioned above when discussing her obesity, the ALJ found that Dr. Gilbert's restrictions were not supported by the medical evidence, and not consistent with his exam findings and plaintiff's activities and work history (Tr. 26).

The ALJ stated that he had given consideration to all of the plaintiff's subjective allegations, but had found them to not be completely credible. Although she had other impairments in addition to her severe mental impairment, he once again stated that he found the evidence to indicate she had no more than a minimal limitation in performing work related tasks caused by those physical impairments (Tr. 26).

Based upon the plaintiff's age, education and work history, as well as the effects of her severe mental impairment, the ALJ noted that the VE had identified a significant number of jobs which a person with the plaintiff's impairments could perform. Accordingly, he found that she was not disabled (Tr. 26-29).

Plaintiff asserts that the ALJ erred in not finding that the plaintiff's obesity and diabetes were not severe impairments. She notes that the Sixth Circuit has consistently held that proving an impairment is severe at step two is a *de minimis* hurdle. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). The *de minimis* standard at step two exists to allow the dismissal of claims obviously lacking medical merit. *See, Griffeth v. Commissioner of Soc. Sec.*, 217 F. App'x 425, 428 (6th Cir. 2007), and *Farris v. Sec'y of*

*HHS,* 773 F.2d 85, 89 (6th Cir. 1985). She also points to SSR 02-01p, which states that obesity is a severe impairment when, alone or in combination with another medically determinable physical or mental impairment, it significantly limits an individual's physical or mental ability to do basic work activities. She states that Dr. Gilbert, who was the only examining physician who prepared a medical assessment, found that her obesity would severely limit her walking and standing.

It is true that the hurdle at step two is *de minimis*. However, as pointed out by the ALJ, the regulations and SSR 96-8p require that when *any* severe impairment is found at step two, the ALJ *must*, in determining the residual functional capacity after step three, consider the effects of *all of the plaintiff's impairments*, including those which are not severe. The Court believes that the real importance of whether any impairment is found to be severe at step two, is to clear that step and continue with the evaluation process, provided that the ALJ adequately considers the effects of any non-severe impairments in making the RFC finding.

Here, the ALJ performed just this sort of analysis. Although he denominated the plaintiff's diabetes and obesity as non-severe at step two, he examined the evidence in detail and explained what the effects of these conditions were on the plaintiff's ability to engage in substantial gainful activity and what evidence he considered in making that determination.

With respect to her obesity, the ALJ noted that the plaintiff had been overweight since she was a teenager. Her obesity did not prevent her from working for 15 years at

11

her prior medium job as a grill cook. A condition that plaintiff had while she was still working detracts from a claim of disability later when she seeks benefits. See *Bowen v. Soc. Sec. Admin.*, 581 F. App'x 544, 545 (6th Cir. 2014). Also, as pointed out by the ALJ (Tr. 18) and the Commissioner in her brief, the plaintiff received unemployment benefits for 2011 and 2012, after her alleged onset date of June 1, 2010. This certainly detracts from a claim of disability which predates the receipt of those benefits. See *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 801 (6th Cir. 2004)("Applications for unemployment and disability benefits are inherently inconsistent").

The plaintiff's wide range of daily activities also indicates that her obesity, and the effects of her diabetes, would not interfere with her ability to work. The plaintiff lost her last job not because of any infirmity from any of her conditions, but because she was terminated (Tr. 132). She cared for her father-in-law by cooking his food and doing his laundry. She also cared for her cat. (Tr. 147). She listed her daily activities as preparing daily meals, cooking, cleaning, doing laundry, getting the mail, shopping, managing her finances, reading, and visiting with friends and relatives (Tr. 148-150). When asked what she was able to do before her "illnesses, injuries, or conditions" that she could not presently do, plaintiff truthfully answered that she didn't know (Tr. 147). Likewise, when asked to describe any changes in her social activities since her illnesses, injuries or conditions began, she stated there were "none." (Tr. 151).

It is true that the plaintiff has diabetes, and that she is, unfortunately, obese. However, the mere existence of these diagnoses does not lead to an automatic finding

that they are severe, or, more importantly, that they prevent a person from engaging in substantial gainful activity. The State Agency physicians opined that the plaintiff had no physical limitations (Tr. 283, 296). Dr. Gilbert found very little on his physical exam, but reached the conclusion that with her weight, she simply must have restrictions in standing and walking. The ALJ did not see the basis for Dr. Gilbert's severe restrictions in his examination notes or the record as a whole.

With respect to plaintiff's diabetes, the ALJ also considered all of the evidence regarding its effect on plaintiff's ability to work. Plaintiff had diabetes since 1998, but worked for 12 years after that. When the plaintiff took her insulin and did her testing, her blood sugars were greatly improved (Tr. 249). Her foot examinations by Dr. Schilling were essentially normal, and he rated her at zero risk regarding foot problems (406-407). Also, she told Dr. Gilbert that her diabetes caused her no complications that she was aware of (Tr. 249).

Plaintiff asserts that the ALJ improperly neglected the fact that the plaintiff's resources did not enable her to be totally compliant with her diabetes medication or in purchasing special foods to help control her diabetes. However, the lack of financial resources, which is certainly not something that can be helped, does not explain her decision to live a sedentary lifestyle when she knew that exercise is a vital component of living with diabetes (Tr. 312, 316). She knew the importance of trying to eat a healthy diet, but she blamed her diabetes, in large part, on her consumption of large amounts of starchy foods (Tr. 40). Noncompliance can certainly be considered by an ALJ in

13

determining whether a plaintiff is credible about the severity of his or her condition. *Blaim v. Comm'r of Soc. Sec.*, 595 F. App'x 496, 499 (6th Cir. 2014)("Blaim's persistent noncompliance with his medication and his persistent disregard of his doctors' advice, moreover, suggested that his conditions were not as severe as he made them out to be").

Irrespective of whether there was any procedural error in the ALJ's failure to find that the plaintiff's diabetes and obesity were severe at step two, the ALJ properly went beyond that step and analyzed all the evidence in the record regarding these conditions, and there is substantial evidence to support his findings regarding the limitations they impose on plaintiff's ability to engage in substantial gainful activity, and for his RFC finding upon which the question to the VE was based. Accordingly, it is respectfully recommended that the plaintiff's Motion for Judgment on the Pleadings [Doc. 21] be DENIED, and the defendant Commissioner's Motion for Summary Judgment [Doc. 25] be GRANTED.[1]

Respectfully submitted,

  s/ Clifton L. Corker
United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).